First matter is U.S. v. Townsend. Mr. Donahue. Good morning, your honors. Keith Donahue from the Federal Defender's Office for Joseph Townsend. If I may, I'd like to reserve three minutes of my time for rebuttal. Thank you. Your honors, this case is about what limits the Fourth Amendment places on police discretion to search the very private information that accumulates on our digital... That's correct, your honor. So, we're submitting that the proper principle in guiding the execution of a warrant is broadly speaking one that fits within the rubric of minimization. And all we mean by that... The rubric of what? Minimization. Uh-huh. And all we mean by that is that as a search proceeds, it must be reasonably devised by the officers themselves to avoid intruding unnecessarily upon private material. To be very clear... The proponent is saying the standard is just reasonable risk and that's it. And I guess you're saying that in this context, given the 9,000 files that were on that thumb drive, reasonableness requires some concept of minimization. Otherwise, it's not reasonable. Is that what you're arguing? That's just right, your honor, yes. And can you point us to a case that says the Fourth Amendment includes a minimalization component of the sort that you're advocating? Yes, I would point the court back first to the case of Burger v. State of New York. And there the Supreme Court said that when a search by its very nature is broad and tends to uncover... That involve wiretaps. That involve wiretaps. That it must be conducted in such a way to assure no greater invasion of privacy than necessary. And then after that we have the Wiretap Act that gives us the minimization requirements, but that's legislative. That's not... There's no... Can you point to a case that talked, as Judge Jordan said, that talked about minimization? Yes, I have to trace through a lot of precedent, but beginning with Burger, that sets forward this minimization principle in the wiretap context. And then perhaps the most important case for us is Andreessen v. Maryland. Before you move forward, stick with Burger for a second. What is it that makes you believe that that language is saying something other than or in addition to the idea that a reasonable search should not go beyond what's reasonably necessary? How do you get from that that there's some additional or added requirement? Well, it's that in Burger the court specifically referred to no greater invasion of privacy than necessary. Isn't that just another way of saying that a reasonable search doesn't intrude where it doesn't have to intrude? I don't think so, Your Honor. I think it's pointing to a specific subcategory of searches, whereas Judge McKee pointed out reasonableness is an amped up, if you will, standard. So by your logic, a reasonable search could range over stuff where it's just plain that there's no chance of finding things? No, certainly not, Your Honor. I don't think officers could search in places where it's plain there's no chance in finding. So in a physical search, they couldn't search in a desk drawer for a rifle. But it is going to be difficult in a physical search to zero in more precisely than that. But by contrast, in the digital context, the police have advanced forensic applications whose very purpose is to locate the evidence for which they have probable cause. So in its warrant application here, Agent Hartman identified a problem of digital searches to be that file extensions can be changed to try to disguise evidence. But, Your Honor, there exists today a leading forensic application that pinpoints any files whose extension names have been changed. For that proposition, I refer the Court to the United States v. Perez case at 2015 Westlaw 349-8734. Did Mongeon say he used NCASE and I guess one other suite of software apps? Does NCASE include that feature? As far as I know, Your Honor, the feature we focused on is NCASE's hash value searching feature, which is particularly pertinent here. That only allows you to find known copies of child pornography, things that have been categorized already and assigned a hash value to it. So how would law enforcement search for unknown images, previously not found images? Yes, but I think that helpfully points out, Your Honor, that it's going to vary from search to search. So we're not saying that hash value searching is always incumbent on the police in a child pornography case. Then what are you saying? Because you seem to make that the central part of your briefing and your argument is that they should have gone with hashing, but you've acknowledged here, as I think you have to, that as a technological matter, newly produced child porn isn't going to be in those hash files. They're not going to know what it is, so they've got to go beyond hashing, don't they? Not in this case, Your Honor, because based on the specific probable cause showing that was made in the warrant application, it's clear that agents knew at least one of the images, and in all likelihood many of the images, but at least one of the images was of a kind for which they had a hash value. You're suggesting they have to limit it to only images of known victims. No, I'm saying in this case, based on the facts of this case, that's where they had to start. Why? When you say that's where they had to start, where in the Fourth Amendment is there a technological rule that the police have to follow a certain protocol, a certain algorithm, if you will, start with hashing, then go to this, then go to that. Where in any reasonableness analysis, in any case, do you find that? I don't find in any case the notion that there is a specific protocol or specific sequence that police have to follow. What I'm saying is they have to take the facts of the particular case before them, and based on those facts, calculate their search in such a way that it intrudes as little as possible upon private material. So in this particular case, where the very first way the investigation began was when AOL identified a file by use of a hash value, they knew that if they had the right device, that hash value was going to turn up the image for which they were searching. Once they did that, they could search more broadly, including for images without hash value. You lost me there. Why? Because if they didn't turn it up, are you suggesting that then they couldn't search more broadly for something that they have reason to believe is actually there, or been deleted, they can then find traces that it's been deleted? Well, if it's been deleted, they would still find it, Your Honor. So why would they have to do that? Why would they have to start with something, a known hash value, and specifically start looking for that? Because where does that take you? If they find it, you're saying, okay, they found it, they can then go further. But if it's in the reverse hospital and they don't find it, then they really know they need to go further because there's evidence that they reasonably believe was at one time on that drive and it's not there anymore. Well, I don't think that's correct, because I think that if they're not finding it, it means that it's never been on that drive. AOL calls them and says, we've identified an IP address associated with a file pattern or file signature that is consistent with known child pornography. So they get the administrative warrant, they go to AOL, they find out whose account that is, and then get the warrant for the guy's house. When they go in there, they have every reason to believe that some computing device in that house has access, either downloaded or sent, more than access, downloaded or sent, a digital file that has a signature, if you will, that is so close to a known child pornographic file as to suggest that that file is on the disk. Now, you're saying if they go in and they don't find it, that tells them that they're wrong? But to me, that would simply suggest they've got to look further, because they know from AOL that the file was there. I think I'd focus on a portion of your judgment. You mentioned that there are going to be a number of devices in the home. So it's important for them to decide whether they have the right device. This is important because it's a way of protecting privacy on the part of roommates and family members who are using the same IP address. That does not mean that there may be another device B and C and D and E that may be out. But there could be an innocent device there. There could be a laptop that I, as a roommate, am using. There could be, but going back to your physical analogy, if you're searching for a handgun and somebody tells you, I think it's probably in the dresser drawer, if they don't find it in the dresser drawer, do the police have to walk out and say, it wasn't in that drawer? Or are they allowed to look in other drawers, in between the mattress and the box spring and in the closet, because they've got credible evidence that the gun is in the bedroom? What you seem to be saying is you get to look in one drawer, and if it's not there, pack it up and go home. No, I certainly don't mean to say that, Judge Jordan. So to take it back to the hash value area, I'm not even saying that once they didn't find a hash value they'd have to stop. What that would start to indicate is that they might have the wrong machine. So a step I've said as one possibility that they could do next is they would then search all the traces of electronic messaging on the machine to see if this suspect's username, this person with the handle lovelittlevids, had ever in fact communicated from that device. Now, if that turned up nothing, we're going to dispel probable cause for that particular device, and at least for the time being, it would need to be set aside. Now, if further information emerges, they might come back. When you say it would dispel probable cause for that particular device, did the police have to, or investigators, have to assume that somebody is using a single address? A single device. Or a single address. A single username. No. So in this case, I would say to search for lovelittlevids, they would search through all the headers, and if they saw another header that was suggested through child pornography, then that would cease to dispel probable cause. But my point is they have to articulate some way. I'm articulating one way. It seems very clear on the particular facts of this case. Well, they did articulate it. It's the way that the agent proceeded. So tell us what's wrong. The agent uses a software suite that allows him to look at, to rapidly scan thumbnail images, and as it turns out, what, roughly half of the 9,000 pictures are child porn. Is there, what's wrong with taking that quick global scan to see if there's quickly identifiable problems? Because images are very private, Your Honor. On the facts of this case, when they had at their disposal a tool whose very purpose is to seek out the evidence for which they had probable cause, it was overly broad to just delve into all the images. More than 4,000 of which were images. Well, tell me what else he did with that argument, because I thought that's what he did. He went into the gallery. He clicked on the gallery view pane of end case, brought up all of the images, and then made a determination. Initially, he could determine, well, this is not the right machine, because based upon what we're finding out from AOL, there's got to be more than this. And then they look and they find the thumb drive. And you're saying, take me from that point. What if they did the same thing with the thumb drive? They opened it up. They find 9,000 images, half of which are 9,000 files. About half of the files are pornographic images. What happens then from your perspective? Is he dead wrong so far? My point is that that first step was illegitimate. If they had found the images of child pornography through a technique reasonably devised to minimize privacy, and then they found the image, they would pretty much at that point, I think, be off to the races, Your Honor. But I don't think it was legitimate to just delve into all of the images, which as Riley tells us, Riley v. California, is an extraordinarily private type of information. It says you can piece together the entirety of an individual's life through 1,000 images. There were a good 4,000 images on the machine. That might be the case if we're dealing with a prosecution that didn't concern, you know, they had probable cause to search for child pornography as a child pornography prosecution. I don't know how you got Beyonce to be aware it was a prosecution for fraud and ended up finding child pornography. You know, I just don't see the connection here between what you said was an overly intrusive or unreasonable search once they had probable cause to search the digital devices. It seemed to me that they could use the procedures that were reasonably calculated to find evidence, and these procedures were. I mean, look at all the images. That will tell you whether there's child porn there or not. Well, I think in this context where digital is different, the rule is slightly different from saying they have to use any means reasonably calculated to find evidence. Your premise is the problem that I'm struggling with. You keep saying digital is different. Is the premise of your argument that because technological tools are available that would allow some kind of searching, you have to use those? That that's incumbent on investigators as a matter of Fourth Amendment law? It's incumbent. No, no, Your Honor. Okay. Because in the real world space, if we imagine that this fellow had a 30-room mansion and he actually printed out his pornography and put it on his child porn and put it on the walls, are you suggesting that if the government got a search warrant to search for pornography in the guy's house, they couldn't go into every room and look on the walls because they might see a picture that wasn't pornographic and that's really private? No, I'm not saying that, Your Honor. Then why is the digital world different? If they know that there's pornography, or I should say if they've got probable cause to believe that there's pornography on the digital devices, why can't they scan the images to see whether there's pornography? Because scanning the images is more intrusive than was reasonable. How is it any more intrusive than walking into Bedroom 4 or 5 or Living Room 6 and scanning the walls? Well, because in that case you have an open display. It just isn't much of an intrusion to walk into the house and suddenly you're seeing the walls. It's in somebody's house. The Fourth Amendment, if it's about anything, it's about protecting someone's home. There's more rights in your cell phone than there is in your home? That's what the Supreme Court said recently in Riley v. California. Riley says your cell phone is more sacrosanct than your house. Yes, it said that a cell phone contains a broad array of private information never found in a home in any form unless the cell phone is. Well, I know what Riley says, but I never supposed it to mean that your cell phone was a higher order of privacy concern. Than your bedroom. Than your bedroom. Yeah, that's a new one for me. Yeah, but courts have said that specifically as well. The Andrus decision out of the 10 circuits said computers are more private than bedrooms. But the unique thing is the sort of information that's on these devices. So when you're searching a home, you might find, say, the newspaper I read today or yesterday. When you're searching a laptop, you're going to find every newspaper I ever read, every article I read in those newspapers, and that's a more revealing search. It's a particular kind of activity that is actually more than the physical items in a home. Let's take that as true, but that still doesn't answer my concern. What he did was go to the gallery view. If he saw a text file, he'd say he did not. Now, I don't know what happened. We're talking about the initial, I guess you'd call it preview. We're not talking about the three-week inventory or rummaging. I don't know how to describe it later on, but it went through a lot more. And I assume that your minimization was aimed at the second search, not the first search, because you're talking about the execution of the warrant. But am I wrong about that? Are you challenging what they did in the house as well as what they did later on or just one or the other? Yes, I am challenging both, Your Honor. What is wrong with what he did in the house? It seems to me that later on when they confiscated the computer, that's a whole different kettle of fish. In the house, he did do a quick scan to the software cranked up, took him four to five minutes to load everything into the gallery view, quick scan to see which were the image files, to recognize once he found the thumb drive that the majority of those files were consistent with what they were looking for. Up to that point, what is wrong? Because it seems to me you're arguing that at that point there's a problem. Not later on there's a problem, but at that point there's a problem because he should not have used NCASE or gone into gallery view. I'm not quite sure which one. He should have used NCASE, but rather than use it to just delve into every image, which I am candidly insisting are very private, a thousand private images. I think that's a very strong privacy interest. Well, look at his NCASE. Look at the thumbnail. You say he should have used NCASE, but he shouldn't have looked at what turned up in the gallery view? He should have used the hash value searching capability that would have let him not just look at every image on the machine, but instead focus in on whether the particular images for which he had probable cause were on the machine, or he should have used some technique in his search whereby he could reasonably articulate how that was devised to minimize the intrusion. Because he didn't actually articulate that. His principle was that it's his prerogative to look anywhere he decides it's important to look. Maybe he could have articulated a minimization principle, and maybe government agents will have little problem doing so once this court reminds them that that prerequisite exists. Did you save some time for that one?  Yes, I did, Your Honor. We'll hear from you again. Okay, thank you, Your Honor. May it please the Court, my name is Emily McGillip. I represent the United States. No pressure, Ms. McGillip. You've got the entirety of the United States Attorney's Office looking over your shoulder. I just don't want to interrupt or anything. I prefer to think of this as a cheering session. I don't hear any rah-rahs coming from over there at all. Let me ask you this. Forgetting about what happened in the House, Judge Razzell was clearly concerned here because he basically said to Agent, is it Mon-June or Mon-June? I don't know, Your Honor. Let's settle on the pronunciation and use it even if it isn't correct. Let's call it Mon-June. He basically said to Mon-June, so what you're telling us is that we have to trust you. That's your limiting principle. And the Agent says, yeah, that's right, trust us. Do you know of any Supreme Court case where the limiting principle of the First Amendment reasonableness is trust the government? Yes, Your Honor, I do. And I was going to begin by apologizing to the court because I do need to call the court's attention to cases that I had omitted to cite in my brief. And the first is Dalia, D-A-L-I-A v. United States, 441 U.S. 238. It's a 1979 decision. Give us that cite again, please. 441 U.S. 238, year 1979. And in that case, and this was the case where it was decided that if you have a warrant to place a physical bug, that in executing that warrant, it is lawful and reasonable for the agents to make a surreptitious entry. Okay, well that's... And so the facts are slightly different, Your Honor, but it involves the execution of a lawful warrant. And in that context, the Supreme Court said, nothing in the language of the Constitution or in this Court's decisions suggests that, and I'm eliding a little here, search warrants must also include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant, subject, of course, to the general Fourth Amendment protection against unreasonable searches and seizures. So with all due respect to the very learned District Court, he was incorrect in saying, in suggesting that it was wrong that it was left to the agent's discretion. In fact, as the Supreme Court says in Dahlia, it is entirely proper that the execution of a search warrant left to the discretion... Excuse me, Your Honor, I have no time to read the whole thing, I'm just kidding you. But it appears to be a situation where the District Court ruled that under Title III, a covert entry to install the bug was not unlawful, merely because the approving court did not explicitly authorize the type of entry. Is that the principle you're relying upon? There was a warrant that did not specify the... How you get in there. How to execute the warrant. And the Court's statement is not limited. It says quite clearly, it is generally left to the discretion of the executing officers, subject to the reasonableness... But what is it that's being left to the discretion? What is it that's being left to the discretion? How you get in to plant the bug, or what you do once you get in? How to proceed with the performance of a search authorized by warrant. This was how to install a bug. Those were the facts, but the Court's language is not so limited. It is broadly expressed, and that is the way the Courts have treated it. It was to put an eavesdropping device in, and then it would be subject to minimization requirements. So they would not be able to listen to all conversations. Your Honor, I'm not sure that at the time this was decided. Well, it was under Title III. It says right under the statute. It says under Title III, so the statute would have provided the minimization that would have restricted their discretion. But they're talking about how to place the bug, which is not the minimization requirement, which, as Judge Van Asken noted, is statutory. It's not in the Fourth Amendment. There is no basis for applying it to this case. So what we have here is the Supreme Court saying... Are you fighting against the idea that a search...  Does that language that he quoted from Burdard, does that add anything to the Fourth Amendment, the idea that you shouldn't go past what you ought to go past in making a search? No. No, Your Honor. It is the reasonableness principle, and the District Court was concerned that the discretion of the agents executing it was essentially untrammeled, and it is not. It is restricted by the post hoc reasonableness review of the District Court, and that is entirely appropriate because, as every court to discuss this has noted, these are fact-driven cases. Yeah. And I'm afraid of Burgess, which noted particularly that searches are dynamic. Yes. They change. It depends on what you find. Why don't you speak to us about Stabilia, if you would, where we're specific about saying there are countervailing pressures here when you're doing computer searches, and specifically we said, as Stabilia argues, granting the government carte blanche to search every file on a hard drive impermissibly transforms a limited search into a general one. That's the language from Stabilia, and so why don't you tell us why doing this in-case view is not akin to searching every file on that thumb drive and thereby creating a general search rather than a limited one. I would point out a couple of things, and with all due respect, I know you weren't the author of Stabilia, but I know you were on the panel. That's always a dangerous intro. I said, with all due respect, there's always a dangerous intro. If you want to say that, it's wrong. But in this case, that quote, the section you read to me, first of all, is not from Marin. No, it's from Stabilia, which is a binding precedent. It is, but this is not part of the holding. It is a part of the discussion. The court goes on to a balancing of the- You just read some language to us a little while ago, and you said, well, it wasn't really part of the court's holding. And when you read that, I started to say, well, we don't usually put that much weight on dictum. But now you're saying that what Judge Jordan is citing to you in Stabilia is kind of irrelevant now in precedent because it's dictum. No, actually, I think DALIA is part of the court's holding. But what's going on at this stage- Well, it could be part of the court's holding. I don't want to get pulled back into DALIA. But DALIA is about executing a wiretap search warrant. So the broader language you cited to sure sounds or feels like dictum, the statement of a broader principle. Here we're dealing with the same thing. It's the statement of a broader principle. Why is it not something we should be paying attention to? As you note by the fact that it begins with, on the other hand, as Stabilia argues, this shows that this comes up in the course of a balancing of different factors, and it is, in fact, coming from the defendant's argument. The court notes immediately before that that because criminals can and often do hide, mislabel, and manipulate files to conceal a criminal activity, a broad, expansive search of the hard drive may be required. And then cites Burgess, quotes Burgess, for there may be no practical substitute for actually looking in many, perhaps all of the folders. But what are we to make of this language where we express concern that things in a computer search context could turn into a general and thereby an improper search? A search is a general search when it extends beyond what is in the warrant. And in this case, even the district court found, as you'll see, the district court really did not want to suppress this evidence, but found that he could not because it is quite clear from the record that the search was caverned by the particularity language in the warrant. And that is a sort of review. What particularity language are you talking about in the warrant? I mean, it's focused in on one specific criminal offense, but it is incredibly broad. And I'm not faulting you for that, but it is as broad as any warrant I've ever seen. It is incredibly broad. It is broad, Your Honor, only in the context of child pornography and child exploitation offenses. Like I said, it's focused on one. Exactly. The search within that is incredibly broad. And there is no context. They are not contending. There is probable cause for everything to search for, everything enumerated in that warrant. Now, Mr. Donahue's presentation would like to limit the probable cause to one particular image. I suggest that that is an inappropriately unrealistically limited reading of the warrant. I'm sorry, Your Honor. One of the things that concerns me is the agent said that he was looking because there may be other adults involved. There's nothing to suggest that he had any information to suggest involvement of other adults. He's looking to see if there are other victims, but there's nothing in the record that was developed to suggest, okay, so you find other victims. What do you do with that information? Is that a public safety kind of exception that you're relying upon? These statements that are tossed out there, there's nothing that you followed up on. Your Honor, there's probable cause in the warrant that study, and there's scientific studies show that more than half of child pornography collectors admit to a contact offense with a child. That provides probable cause for evidence that there might be there. And that discussion about looking for an additional adult was made after the agent had already seen videos of the defendant raping his juvenile half-sister. How does that help you? Because he's seen the defendant involved in an illegal activity, and you're saying, well, that suggests that other adults may have been involved. I have no idea where the argument is going. You're saying X? Let me finish. This will go a lot easier for both of us. He has evidence that X is involved in a crime, and that suggests to him that others may be. Doesn't that really kind of lead into a very general kind of search and rummaging around? It was not a general search. There is no dispute, nothing. He never looked at anything that wasn't evidence of child pornography, evidence of child exploitation, which is within the unchallenged warrant. Hold on a minute when you say he never looked at it. I mean, by definition he looked at it, right? That's why they're here saying he looked at the thumb drive and half of the files on that were not child pornography. And he did look at them because he was looking at the gallery view. That's true, Your Honor. I may have said he looked at. What I meant to say was he looked for. And as the Supreme Court recognized in Andreessen, it's inevitable that in looking for the relevant documents, you're going to see innocuous documents. Pretty much, I mean, that's been true since the days of Pemberton. It's no different in the computer. You're going to see innocuous documents. And the warrant provides probable cause to believe that a person who was actively trading child pornography, which is what the warrant shows, was more likely than not to be involved in a contact offense. And then. So is there no limiting principle? You know, there's a quote from a Ninth Circuit case, the Balco case, where the court acknowledged that in the digital world, we're just going to have to accept that there's probably going to be over-seizing. That can't be helped. But they go on to say, this calls for greater vigilance on the part of judicial officers in striking the right balance between the government's interests and law enforcement of right individuals to be free from unreasonable searches and seizures. So we're looking to the government to give us a view. Is there, you know, necessarily you pick up the thumb drive, you're going to pick up all 9,000 files. You're not going to pick up the 4,500 that just happened to be child porn. That's inherent in the nature of the digital device. But do we have some obligation to make sure that when you get a hold of all those things which are not child pornography, you're doing something to make sure that you're staying away from them? They've suggested some way to do that. Maybe it's not practical. Maybe it doesn't make sense. But do you have anything to say other than that's just the way the world works? It's too bad. It's not practical. It doesn't make sense. And it's contrary to one of the fundamental principles of conducting forthcoming searches, which is that you can look in any place where the evidence may reasonably be found. I wasn't inviting you to attack their position. You've done that in your briefing. I was trying to get you to share with us if you've got another position other than the position that this is unavoidable, so trust us. In other words, the very thing that gave the district court some odds. What the district court was overlooking was his own power. You don't trust us. You told me that the courts have been told to do just that, to trust us. Now you're saying don't trust us. It is left to the discretion, subject to the reasonableness review. And that is what has always been a principle in forthcoming law. When you have software that will identify for you files that have been changed from image files to text files. So he said, for example, if I saw something was a spreadsheet or related to TurboTax, I wouldn't look at it. But if you can just pull up only those files which are GIF files or JPEG files or any other digital format or graphic format that he may be aware of and limit it to that search as opposed to looking at other things. And it looked like during the three-week search that occurred after that, the three weeks in which it was searched, they did look basically for almost everything. And the thing that seems to me to hurt your position is he himself says, look, I can't look at everything. I've got to limit my search somehow. So wouldn't it make sense to limit it to some method that would be the most likely in terms of reasonableness to provide child pornography and not go rummaging around through text files and things like that to see if images were hidden in them? Your Honor, this agent did not rummage and never said he rummaged. And I'm out of time, but may I respond to your question? Well, he didn't do the subsequent search. So whoever did the subsequent three-week search, that's the person. Yes. Agent McJone did both the preview of the site and the three-week search. He did not rummage. As he said, I do not have a checklist per se, but you have to be organized, generally because of the volume of these. He said a number of things. Granted, not the most articulate agent in the world, but he used NCASE. He did some keyword searches. He looked in the registry. He looked in the email traffic. He also looked to see what sites he had visited. That really bothered me. Why would he want to see what, when you've got all this other stuff, a boatload of evidence to tie to this guy's neck, he's looking to see what sites he visited. He's looking to see maybe he's going through the course of the search. I'm not suggesting that was his motive, but it could have been. What kinds of things he likes to read. Is he a proponent of Kafka? I mean, why is he looking to see what he is reading on the Internet? Because what he's reading on the Internet could very well be child porn. That's what he's looking for. He's not looking for Kafka. The statute doesn't prohibit reading. I guess you could have a textual format that would be child pornography. But that's not what this case is about. This case is about the graphic files on his computer, the search for graphic files on his computer, not what he's reading on the Internet. And the agent is nevertheless looking for the cookies and things that are planted on the browser to see what sites he is looking at on the Internet. Those sites are one of the ways that they get the images. And he had them. He had some. We don't know. The full scope of the defendant's criminality is relevant. Even if that doesn't make a difference. He had 4,000 files. He got them with producing, distributing, possession. I'm not sure that's what he needed. You can tell that the thing that concerns me, I think I just said it, is the fact that why are you looking to see what the guy is reading on the Internet? The case is not about what he's reading on the Internet. The case is about possession, distribution, manufacture of child pornography. He got them cold on all that stuff. He got them dead to right on the contents of his phone drive. Your Honor, you're saying two things. You're saying we have enough evidence. We should have stopped. But I am more concerned about you saying, you're suggesting that he shouldn't have been looking to what the subject's Internet searching, reading history should have been. And that concerns me very much because there are websites that are purveyors of these images. We clearly visited them. You've got them. I'm sorry, a second, sir. That's my point. We're not arguing about any of that. This guy knew where those websites are. He had downloaded from, I assume, those websites or other websites. But where he got it is not relevant. He has it. He produced it. He distributed it. Your Honor, he didn't do so in a vacuum. Your Honor, I agree. We are always interested in what people are reading on the Internet. Is that what you're telling me? Where he's getting his child pornography and who he's getting it from and who's putting it up there, if he downloaded an image from a site and we can get to that site and find out who put that image up and maybe who victimized that poor child, we are interested in that. It's a legitimate interest of law enforcement. Something like that on the record from the agent, because he said nothing like that in his testimony. He was allowed to look, Your Honor, and that's why he was looking. And furthermore, Your Honor, we have managed to find sites where we managed to find the financing behind the credit card companies, and we have taken down sites that way. Here we are again. If you'll let me speak, it's easier for both of us. I apologize, Your Honor. What you're saying now is persuasive. The agent apparently had none of that in his mind when he went to see what he was reading. I don't know. I guess you weren't the person who handled the subversion there. Absolutely not. But none of those questions were asked as to why he was looking to see what this guy was reading. Now, maybe that record could have been developed. It wasn't developed, and the burden of proof is currently on the government. But nobody asked him, Why would you be interested in what this guy is reading? Why do you want to know what websites he's visiting? That's a very open-ended concern that I have that you don't share. But what you're saying now addresses that concern. It never was developed during the course of the discretionary. I suggest, Your Honor, that his testimony about looking at what the defendant was reading on the Internet must be viewed in the context of his repeated and undisputed testimony that he never looked for anything that wasn't related to child pornography or child exploitation. He wasn't interested in Kafka. He wasn't interested in the guy shopping for shoes. He was interested in this man's activities with regard to child exploitation. That's all he looked at, and because of that, you can assume that when he was looking at websites, that's why he was looking. Can I ask this one? I know we're out of time here, but I do want to take one last crack at this then. Does the government have any suggestion which is more specific than the position it's taken citing Dahlia, which is it's the unfettered discretion of the government how it approaches a search? Because if that's the position, that's fine. I'm just asking.  We do not have any position, Your Honor, and there are good reasons why I express those. I think we've answered the question.  Thank you, Your Honor. Judge McKee, I'd like to focus in on your pointing out that Agent Mongeon didn't say anything like what this Court is being told today. And I would submit that the reason he didn't say anything is because his principle was it was his prerogative to look wherever he wished to look. His principle was anything could be disguised child pornography, so I need to be able to look at anything and not take any limiting principle. And tell us what is incorrect as a matter of Fourth Amendment law for an officer to, in fact, take that approach to say I have a warrant. It's duly authorized. You've not disputed the scope of the warrant. It's very broad. And it's a very broad warrant. And it's a fact that it's a technological matter. File names can be disguised. Things can be embedded. If I'm going to look for child porn throughout these electronic devices, I'm going to need to look broadly and wide-rangingly. What is infirm about that as a matter of Fourth Amendment law? Well, I think as a matter of Fourth Amendment law, what's infirm is that there is a minimization requirement. But the agents themselves recognize that at page 20 of the appendix. When they're first applying for a warrant to AOL, they say I would search a computer the same way I would search a file cabinet. I would try not to just look at everything but to minimize the search I'm making. And that traces back to the Andreessen v. Merrill. I'm not sure that helped you because I understand you made that analogy in your own mind. But when you search a file cabinet, you've got to open up all the files. You look at the paper, and if the paper is not evidence of tax fraud or some other crime that you're looking for, you close it, you put it down. But you've got to look at it to see what's there. And you don't limit yourself just to the files that are labeled RICO. You look at all the files, no matter what's on the file folder. Because the person may be smart enough to put the paper tying him or her to a RICO offense in someplace other than a file folder in which he is labeled RICO. He may not label it that way. That's right. So you would have to look. You wouldn't be limited to just looking in files labeled RICO. But let's say you have a search for papers where what you're seeking are faxed transmissions. In that case, I would submit, you can't look at the face of legal-sized documents. Those could not be what you're looking for. Why not? Because you get faxes from Europe where they fax stuff on a larger document. You can have old-school fax machines, thermal paper where they cut it off at different lengths. I mean, if you're looking for documents and you're open in folders, how do you know whether there are legal-sized sheets of paper in there that are folded up to be 8 1⁄2 or 11? I mean, the point is, you're looking for documents. You're open in folders to find it. You're going to look at some that aren't your document, and you say, okay, and you set it aside. Well, I think you're right. I mean, that demonstrates why minimization can still be there. This is one for me. But the thing is that officers should have to articulate the sorts of facts that you just articulated. It's fair to say why they need to look for legal-sized documents, that there may have been transmissions from Europe. So does it depend on an after-the-fact assessment? I mean, does it really come down to just how good the agent is on the stand after the warrant's been executed, about whether the agent can come up with a perfect explanation instead of just saying, look, I had a warrant. I was looking for this stuff. I thought a good way to do it was to look at the thumbnails, so that's what I did. I mean, are we requiring agents to be, you know, any better at that? You're certainly not requiring them to be perfect, but I think what does need to be required and what they need to be reminded of is they need to be able to articulate what steps they took on the facts of the case to zero in on the particular evidence for which they had probable cause. And there might be different means. That was his articulation, and that's what I keep trying to press you on. This agent says, I started out by taking a broad view. Pull up the thumbnails and scan and see, am I in the right spot? Because here's one of the places where, bless me, the digital world is different from the physical world. I can, instead of taking, you know, five hours to spread all the paper out on the floor, I can see thumbnails quickly and I can see I'm in the wrong spot and move on. That's his articulation, as I understand it, of what he was doing, and I'm pressing you to find out that's just a matter of common sense, reasonableness. What is wrong with that approach to saying I'm looking for bad pictures, let's look here a bunch of pictures, take a quick scan. No, it's not those. Well, I agree with you on the general principle you're stating, that there could be different ways of minimizing in different cases. But where our disagreement does come down to in this instance, I believe, is that I think you had to do hashing first. Or at least something more precise than simply looking through all images, because all images are very private. They paint a picture of a person's life. Okay, thank you, Mr. O'Connor. Thank you, Your Honors.